Karen Milholland for St. Paul Surplus Lines Insurance Company. May it please the Court, I'm going to address first why the District Court incorrectly interpreted the Texas Prompt Payment Act requiring reversal of the $1.2 million interest award against St. Paul, and second, why the JMOL on bad faith should be affirmed. With respect to prompt payment, the District Court incorrectly interpreted Section 542.056 of the Prompt Payment Act as requiring an insurer to accept or reject a claim once it receives all information reasonably required to determine coverage, but 056 does not include the words reasonably required or determine coverage. The plain wording actually says the deadline starts to run after the insurer has received all items, statements, and forms required to secure final proof of loss. The District Court conflated industry terms of art, mixing up a proof of loss with a coverage determination. A final proof of loss is the last act necessary and the precursor to acceptance and payment of a claim. It includes, but it does not comprise alone, a coverage determination. That's because events can fall within a coverage grant without resulting in a covered loss. For example, an insured may have no insurable interest so that the insurer doesn't have to pay, or the insured may have suffered no actual loss. The statute does not define what comprises a final proof of loss, and that may differ depending on the type of policy involved or the type of loss. But there — What's the standard? As you said, it's not defined. To use a word from the last argument, it's fairly vague, and I think you acknowledge it doesn't require every single piece of paper to be received by the insurance company. So what — What standard can we use? Your Honor, if you look at — there's general agreement in the case law and in authoritative commentators of what comprises a final proof of loss, in particular, identity of the parties making the claim, the insurable ownership interest, the covered cause of loss, the evidence of the amount of the loss, and proof that the insured has actually sustained an out-of-pocket loss. Those are the elements that you see repeatedly identified in case law. And it's undisputed here that St. Paul did not have those fundamental items, that fundamental information that was necessary to secure a final proof of loss. What didn't they have? They were missing three items, Your Honor. As of November 6, 2009, the date the Court found a violation, they were missing three critical items to secure proof of loss. The first was evidence of actual loss. Evidence of an out-of-pocket loss is a standard proof of loss item, and this insurance contract — Had none? Correct. They had no evidence that Weiser Brown or the other working interest owners were out-of-pocket and had paid any amount of the invoices that had been incurred for the control-of-well event that they alleged was an underground blowout. What about that spreadsheet that listed a whole bunch of different costs? They had that — Your Honor, what that was was a partial submission, and the Act doesn't address partial submissions, but all it was was invoices of all the costs spent at the well from the day of spud until it was plugged and abandoned. And what the adjusters have to do is go in behind those invoices and find out what work was being done to see if it fits within the coverage of the policy. This is a control-of-well policy, so it only reimburses out-of-pocket costs that are related to bringing a well back under control. What is your response to the district court's finding on that, that they essentially paid their bills, and consequently you could assume loss, more or less, said that? Well, I'm not sure that the court found that, Your Honor, but you cannot make that assumption. What did the court say then? How did the court cover up that particular point that you're making now so as to conclude as it did? The court never got to that analysis. What the court did was conflate a coverage determination with a proof of loss. And what the court said was, as of November 2009, you had sufficient information to determine whether the claim was covered. But that's only a piece or a part of a proof of loss. The testimony was undisputed in this case. Weiser Brown's claim liaison testified they did not give the adjusters . . . The court may have misspoken in the sense that whenever it spoke of coverage, it was both the insurance coverage of the incident itself as well as the amount of loss. It's certainly a possibility, Your Honor, except that's not what you find in the findings of fact. And what the court appears to have done was determine whether there were sufficient engineering facts available to determine whether there was underground flow going on that would constitute an underground blowout. The correct analysis does not seem to have been made. Because not only were we missing the final invoices that would have shown the amount of loss, we were missing the evidence of the insurable ownership interest here. Weiser Brown owned 3 percent of this well. What it did was claim the rest, the 97 percent, other working interest owners, saying that it had an obligation to carry their insurance. But it never provided proof of the opt-in forms for the working . . . Is it a general operation of a well like that that the operator does agree to bear the costs of insurance among other costs? Depends on the particular well, Your Honor. Some working interest owners prefer to carry their own policies. Some will opt-in for the operator's insurance. So in a situation like this . . . Generally speaking, I mean, would it be a proper assumption for the insurance company to assume that if they were the operator, they would have paid those costs? I don't think that can be assumed, Your Honor. There are too many cases where that assumption has been made, and when investigation has been done, it turns out that, in fact, there are no other people involved in the insurance, or that the person carrying the insurance has no insurable interest in the well. That's why this is one of the fundamental proof-of-loss items that's required for all indemnity and property policies, is proof that the person making the claim is actually  This particular policy, remember . . . $50,000 amounts lost. Has actually paid the loss. In this case, Your Honor, this policy has reimbursement wording. What it does, it says it will reimburse the insured for actual costs incurred to bring the well under control. That means the insured has to show that it has an invoice, for example, from a control of well provider, and that it paid that invoice. Just pausing, if you could answer a few quick questions on that. If the position is that final proof-of-loss requires various bits and pieces, what . . . instead of case law generally, what specific case defines exactly what those pieces are? I don't think there's a specific case. Just give me your best case. It will tell us the orbit of pieces that would ever equate to a final proof-of-loss. If you look at the Texas State Court cases of N. Ray, Republic, Lloyds, and U.S. Fire v. Lynn, those give you some pieces. Some pieces. Yeah, because they're talking about . . . Then tie it to the facts here. If it's a certain threshold of pieces, at what point in time in this case did enough pieces come together to make it a final proof? Well, Your Honor, I think if you look at Lamar Holmes, it tells you that. It has the accrual . . . No, I'm asking you for a date in this case, factually. Oh, the date that St. Paul had all the information? Yes. The testimony at trial was that it was September 2011, two and a half years into the litigation. That was the final point. All the invoices and backup to show what work was done and proof of payment was . . . That would allow you to know, your client, to know how much you need to pay, but the provision we're interpreting, 56, is an accept or reject claim. It isn't a payment clause. Correct, Your Honor. It's a claim-handling deadline. But if you look at all the wording, it says, look at what's necessary to secure final proof of loss in order to accept or reject the claim. And if you accept, you trigger a five-day payment deadline in 057. That means you must have everything necessary at that point. You must have all the invoices . . . But you have a subsection option of requesting more. There is an option in there that it says if another act is required. I've always read that to mean filling out the final proof of loss form, which typically you verify and say that I'm the owner. I'm not aware of any other property owners claiming an interest. I agree. You owe me X number of dollars under the policy. And if that is the case and you only have a five-day payment deadline, that presumes you have all the information at that point that you need to pay the claim. Last question on this point. Guide 1 is a case that seems adverse to your position. Texas Court of Appeals, what's your thought on that? I think it's correct to a point, Your Honor, and then I think it goes off the rails a little bit. It recognizes the distinction between the items requested in 055 and those requested in 056, but it says that 056 just goes to prove generally the amount of the loss, and that's all you need is some idea of the amount. But that can't be the case, because if you're going to accept or reject the claim, you have to know this person is the owner, that they have an interest in the property, and that they have sustained X amount of dollars of loss so that five days later, you can give them a check for that amount. Judge Ellison found that by November of 2009, Weiser Brown had provided most of the requested engineering data, and then he finds that after that point, your client never asked for additional information or said, oh, you never sent us that. And I've looked at some of those documents. You basically, as I interpret it, say, we're not going to provide coverage, or our guy still thinks this isn't a covered loss. You know, you can submit stuff if you think we're wrong, but is there anywhere where you actually say, oh, you never provided us X, Y, and Z, we requested last year. Please submit that so we can figure this out. Your Honor, I'm not sure that there . . . I think there are bits and pieces of e-mails throughout that period, and I would point out that what Judge Ellison was talking about was a waiver concept. He was saying, you waived your right to these fundamental items that you need in order to accept or reject a claim by not continuously reminding the insurant of its burden. I read him to just be saying, look, you got all this stuff in November of 2009. That must have been enough for you to reject or accept the claim, because otherwise, common sense, as you would have said, by the way, we still need X, Y, and Z, or we can't figure this out. No, I think the record does show during that time, Your Honor, that first of all, Weiser Brown admitted and knew that it was behind on its request for information, that it hadn't kept up with them, and that it was submitting things periodically. If you look at the time period beginning in January 2010, on the coverage issue, the independent based on the evidence he had, which was not all the evidence, that it didn't look like there was underground flow. That was communicated to the insured. No response was given, and two letters went out saying, look, you've not given us enough to support your claim here. How long was this after he filed the claim? This was about a year after the claim, Your Honor. In November 2009, well, first of all, the claim was made . . . What letters were given that says you didn't give us enough? What letters are you referring to specifically? Because I didn't see those. There are letters in March and April. Well, first of all, the engineer sends out his second report in January, and the adjuster sends it to Weiser Brown and says, look, we've looked at these few additional pieces of engineering data you've given us. We still don't see an underground flow. Now, during that time, another, for example, on the insurable interest issue, another operator had come in and made a claim on another policy for this same well after Weiser Brown had represented it . . . that it had all the working interest donors. It was aware of that claim and that St. Paul was investigating that and trying to figure out the discrepancy of why this supposed 100 percent ownership had a separate claim part of it over here on another policy. And in addition, Weiser Brown . . . well, first of all, St. Paul sent out two letters saying if there is any other engineering data you have to support your claim, please let us know. There's insufficient amount. We're going to close the file. Instead of closing the file, they then emailed the broker, and that's in the record, saying we've had no response from this assured for months to our request for information, which indicates follow-up was going on. And remember, Weiser Brown's own claim liaison testified that he knew. He knew he owed additional information. And when you look at the history of the court record, all of the invoices, all the records came in two and a half years later during discovery. Now, that's not the type of claim . . . What did you not know on the 15th day after they made the claim? What did you not know that you had to know in order to either accept or reject the claim? Your Honor . . . Didn't have. We didn't know the amount of the loss. We didn't know how much the invoices were related to control of wild work. We didn't know how this policy, the limits, are scaled to working interest. So we didn't know whether to pay Weiser Brown 3 percent if we ever found out how much was owed or if we needed to pay 100 percent. We had fundamental items missing. What obligation does the insurer have under Texas law to pursue the absence of information that it needs to make the determination once it receives the basic claim? Your Honor, under Texas law, there's no obligation. The obligation, the onus is on the insured . . . Completely and totally. . . . to support its claim. Now, under this statute, the insurer is going to be penalized. You can't penalize an insurer for giving an insured every opportunity to support its claim, leaving the claim open for them. Weiser Brown, remember, in June and July, Weiser Brown . . . No, in terms of the statute, of course, is in . . . has a purpose behind it to induce insurance companies to pay and reject or accept claims properly. And it seems to me that, you know, no question, you certainly dragged Griffey. They dragged their feet, but you certainly dragged Griffey's feet as well. Your Honor, I think there is . . . I'm just wondering whether you balance this out at all. I'm sorry, my time is out, but I would like to respond. I don't think that the record really supports a showing that the insurer dragged the feet. The insurer left the claim open for them because Weiser Brown said they were still studying the engineer's report in June 2010 and said they were going to respond. And they did respond a month later in July with a one-paragraph sentence with no substance in it, and they filed a lawsuit. So how can you penalize an insurer if the purpose of the prompt payment statute is for the insurer to promptly pay a claim? How can you penalize that insurer for not paying when the insured has not supported it in giving you sufficient information to pay? That can't be the purpose of the penalty. Thank you. Okay. Thank you. We will now hear from Mr. Pugh, representing Weiser Brown. May it please the Court, Your Honors, William Pugh on behalf of Weiser Brown. Weiser Brown is the appellee with respect to the prompt payment claim and a cross-appellant with respect to the judgment as a matter of law on the bad faith claim. I think the Court's questions emphasize some of the very critical issues that I'd like to just make sure are clear. Number one, Section 56, along with the entire prompt payment statute, has a purpose. It's to encourage prompt payment, but it's also to encourage prompt claims handling throughout the entire process, whether it's notice, the decision to accept or reject, or the decision to file the claim. But the arguments they make, which I mean are fairly persuasive, that the information that you furnished was not a basis upon which to pay or even accept the claim, if they didn't know what kind of interest you owned, if they did not know whether there was in fact a blowout and could not determine that from the information you furnished. Well, I think, number one, they could determine that, and they did determine that, and they with no further information. So they had all the information they could to deny coverage. It's true that they didn't have all the information that they might have needed to pay the claim, but as Judge Higginson pointed out, the issue in 56, Section 56, is to accept or reject. How did they even have enough information to reject or accept the claim if they lacked the vital information, knowing whether you had paid anything out? Because they took the position, at that time and throughout the entire process, that the well was never out of control. They relied on an improper definition used by their expert engineer to say that the well was never out of control, and they didn't advise . . . The question I was asking . . . I'm sorry, Your Honor. The question I was asking, how would they know, if you had not paid anything, you submitted no information that you had needed to be indemnified by the insurance company on any item? That's their position. I don't know . . . Well, I think it's clear they did not have enough information to pay the claim. I don't think there's any indication under the Texas cases, Guide 1 is one of them, Colonial County is another, that the decision to accept or reject under Section 56 doesn't require all the knowledge to be able to pay the claim. It requires, at least for rejection . . . Is that correct, that you had not . . . you didn't submit any evidence of any kind that you had paid anything on any of the invoices? Is that correct? It is correct that we had not produced evidence of actual payment at that time. That's correct. How were you entitled to any indemnification for something you had not paid? Well, we were entitled and did supply the invoices, and that allowed us to be paid. But the problem was, they decided to deny the claim based on the well being out of control. Is that what they said? Is that what they said at the time they . . . Well, they didn't say anything. That's the problem. They didn't accept or reject. They knew that they were going to deny based on the well not being out of control, because that's the preliminary conclusion of the independent adjuster, it's what the expert decided based on the wrong policy provision, on the incorrect provision, and that's the basis that they relied on at a later time. Now they also relied . . . . . . 55 notice. Did they request, as the statute allows, items and information relating to your notice of claim? No. They made no further requests after November 6th. Because when you look at the overall structure, I think one argument that was made was, true, it's an accept or reject, it's not a payment clause, but it triggers a 5 business day payment under Section 57. So the point that she was arguing was it's essentially a payment clause. And I think that's a misinterpretation of what Section 57 says. Section 57 says that when you agree to pay the claim, you have to pay it within 5 days. I don't think that's the same as the accept or reject determination. I think that the . . . Do you accept under 56 and yet then later dispute amounts? Yes. Oh, you know that because you know this area of law, but where is that indisputably? That was sort of a missing piece to the puzzle for me, thinking about it. I think it's clear from the statutory provisions, but I don't know of any specific issue any time that that's been raised. I don't know of any instance in which there's been a Section 57 claim based on an acceptance of the claim under Section 56. Right. But I think . . . It's often the case that the amount of the loss is far more in dispute than whether there's coverage. I mean, is your position, it seems to me, is that there's two different deadlines under 56. If you're going to deny the claim for coverage, that's one date. But if you're going to accept the claim because you need to know the loss amount, that might come months later? Exactly. That seems . . . Well, it's a two-pronged inquiry because remember the purpose of the statute. It's designed to make the insurer respond promptly at each stage of the claim. So if they know they're going to deny coverage, they need to tell the insurer. They can't just . . . But coverage is in the statute. It's not in Section 56. And what triggers Section 56 is the insurance company having enough documents to secure final proof of loss. Well, there's . . . And you need that final proof of loss to accept a claim, don't you? That's some confusion I'd like to really clear up. The statute uses the word secure final proof of loss. There's case law to the effect, I believe it's the Colonial County case, that says there's no case that's ever interpreted what that means. There are cases that say that you cannot avoid a Section 56 claim by saying I was waiting on information about invoices or keys or core samples related to damages. What the issue with respect to a proof of loss, which is what my counterpart, Ms. Millholm, was talking about, that's a document, it's usually one page, it's required to have the claim paid, but it's not the document that's been talked about in Section 56. There's no case that's ever said that you have to have a proof of loss ready, otherwise Section 56 would be meaningless because you never get to the point . . . if they're going to deny coverage, then you'll never get to the point where they're going to issue a proof of loss. Well, it doesn't say the insured has to submit a final proof of loss, but it says the insurance company has to have enough information from which it can basically . . . But, essentially, that would turn it into meaning that that's the absolute last thing in the claim, which would mean that it means the same thing as 57 and 58, which are different provisions that relate to payment of the claim. I thought there were exceptions within the statute in which you could change the final proof of loss at a later point if additional costs came up or mistakes made, or such as that. Well, there's a provision in Section 56 that if they need more time to make the determination of acceptance or rejection, that they can ask for additional time. But if so, there's a 45-day cap on that. The Section 56 is not talking about the term of art, a proof of loss. Well, you say it makes the rest of the statute superfluous. I mean, it says you have to accept or deny the claim within 15 days, and then, you know, if a million dollars are going out the door, you need a few weeks to get that ready. Forty-five days later, you have to actually make the payment. I mean, why is that unreasonable to say that there should be this gap in time between determining what you're doing and then making the actual payment? Well, the point is that as respects to rejecting the claim, it would allow an insurer to essentially do what was done in this case, which is continue, even though they know they're going to deny coverage, they continue not to tell the insurer that they're going to deny coverage. And their position is that as long as they can do that until the insurer either gives up or files suit, then they're insulated from any Section 56 responsibility. No, their position is if you've given them all the information they needed, then you don't have a problem. But they didn't need any of that information to determine that they thought the well was out of control, and they said that throughout the entire litigation. And the Guide 1 case, the Colonial County, and the Lee v. Kaitlin cases make it clear Why would they not need that? I mean, I thought it was, did the policy pay only if it was out of control? Yes. It's a well-controlled policy. Why did they not need any information about whether it was out of control or not? You mean they assumed that it was out of control? They had information, and their expert had determined that it was out of control based on a definition that was not consistent with the policy that they knew about and didn't advise the insured, which relates to the bad faith claim. But essentially what happened is the engineer first, the, quote, independent adjuster evaluated the claim and determined that he didn't think there was a well out of control. Then he hired an expert engineer without telling the insured, and the expert engineer said he didn't think it was out of control. And then they passed that on to the insured. How did they get that information to make those determinations? Was it information that you furnished? Yes, sir. So you are claiming you furnished all the information upon which they based their opinion? Yes, sir. Yes, Your Honor. We provided the information with which they based their decision, and the court said that after November 6th, they never asked for anything else. I still have problems with the fact that you didn't submit anything, that you had paid anything, if you're claiming under insurance policy to be indemnified for, and you have no evidence that you paid anything. Your Honor, we were responding to issues relating to whether or not there was coverage. I don't think there was ever any real dispute or question in anybody's mind that we had paid all of the invoices. The thing is, this is a red herring. The insurable interest was resolved. It wasn't the reason that they weren't paying the claim. The reason they weren't paying the claim was because... Are we talking about within the 15-day period, or are we talking about later? All of this information became resolved. Well, the insurable interest became resolved shortly thereafter, but they still didn't pay the claim. They always denied the claim. In fact, at trial, they denied the claim on the grounds that the well wasn't out of control. So nothing changed from November 6th to the end of trial. They had already made that decision, and they hadn't told the insured about it. To mention briefly the cross-appeal, the jury was presented with evidence that they could determine that these acts were done in bad faith with an outcome-oriented approach that would focus the expert or... Excuse me. The expert looked at a definition of well out of control that wasn't consistent with the policy language. Policy language said any flow of oil, gas, water, or other fluids. The expert relied on a definition of well out of control that required that the fluids be formation fluids. The adjuster noted that the definition was, quote, a bit strict, and advised the insurer. Neither advised the insured. Neither addressed that with the expert, who was never called at trial. Now bring me the points you're making. Bring it back to the relevance of this appeal. The relevance is that they continued to try to manipulate this for an outcome-oriented denial of coverage. This is the bad faith cross-appeal argument. Correct. But there's also a lot of engineering dispute about exactly what happened underground. Your position is that, no, that was sort of obfuscation? Yes. I think the issue was they were focusing on the formation fluids, and there wasn't... They concluded there was no evidence of formation fluids, and based on that decision, they were then prepared to deny coverage. But the advantage of not denying coverage to them before litigation is they can try to avoid any prompt payment risk. Right. Now, sir, it's your position that all the information they furnished you with respect to the underground flow of oil and the out-of-control oil should have been made by them within 15 days from the time you furnished the information, notwithstanding all the disputes we have here. No, I think the factual finding by the trial judge, which is not clearly erroneous, is that as of November 6th, they had all the information that they had reasonably requested. Ms. Milholland referred to the fact that the statute... November 6th is... Bring me back to that. November 6th is when they received the most of the information that they had requested. Correct. Not from our expert, but from our client. Yes. And he's used to come to the opposite conclusion. I'm sorry, Your Honor? The information that had led you to conclude what had happened below. Well, we always thought that there was a well out-of-control and that it met the policy definition, but they relied... They got some final documents, and that didn't change their previously formed opinion that it didn't meet the well out-of-control definition. Simple question. So your position is that it's common for insurers to accept or reject before they know the full loss amount. It's common to reject, because when you reject issues of insurable interest, the amount of the last invoice, a final proof of loss, none of those are required. It would be like a trial judge knowing that he's going to grant a motion for summary judgment, but nevertheless going all the way through trial. You just don't do it when you know. Okay. If they had immediately rejected, they would have incurred no interest penalties under 56. Is that correct? If they were right. But if they ultimately were determined to be... Well, none... And forgive me, Your Honor. They would have incurred no penalty under 56. They would have occurred a potential penalty under 58 when it was determined that they were wrong, but not under 56, and there wouldn't be any bad faith issue. Penalties here are under 56, right? Correct. 56 just wants a decision, up or down. Correct. And I think the cases make it clear... The Supreme Court case discussing Section 56 is Lamar Holmes, and it says these statements or invoices are the last piece of information needed to put a value on the insured's loss, and then it quotes Section 56. Doesn't that indicate you do need some loss information? It's not just a coverage issue? That's a 56 acceptance issue. In other words, if you're trying to say the insurer should have accepted my claim, then yes, the insurer would be correct to say, well, wait, I didn't have the last tiny bit of information on insurable interest or a particular invoice or something like that. But when they know that they're going to reject, to then lead the insured along and keep asking for invoices would mean that there's never a determination under 56, because they're not going to deny coverage because they're trying to string it out, and that's completely inconsistent. So you give them everything necessary to secure final proof of loss. That's what the statute says. There is an end point. But it says everything necessary to accept or reject, and in this case, rejection, when they know, as found by the trial court, that they're going to reject, that's when Section 56 is triggered. Has any case ever said that when rejecting a claim of the district court here, that there's a separate deadline than there would be for acceptance? Well, there are three cases that were relied on by Judge Ellison which say that you can't avoid a 56 penalty by asking for stuff that's not relevant to coverage. Goddard was in a 56 case, though, but I've read those cases. Forgive me. They were analytically similar to a 56 issue. Quickly, with respect to the cross appeal, we think that the judge... Before, sorry. Kratchnik's testimony seemed to say conclusively that they didn't have enough. Do you think the district court just concluded that that was not credible? Again, I think that was talking about accepting and paying the claim. Back to the same distinction. Yeah. I just, I think it's important to understand how the statute's set up. It's designed to govern all the claim process elements, not just the end. It's not just that you can ask for every bit of information in the world. Guide 1 and Colonial County make it clear that you can't avoid a 56 obligation by relying on not having stuff that's not relevant. With respect to the cross appeal, there was evidence that the St. Paul had knowingly let an expert report rely on an incorrect definition of the policy that was very pertinent. Their, quote, independent adjuster testified at trial as their expert. The expert that relied on the incorrect definition didn't testify at trial. If your bad faith claim should have gone to the jury, what damages would you have asked for that you didn't get on your breach of contract claim? We would ask for the treble damages on the policy proceeds under the Vail case. But don't you need separate harm or damages for a bad faith claim beyond...  The Vail case makes very clear that where coverage is denied because of the bad faith action, policy proceeds are sufficient. There's a footnote in Great American that seems to indicate to the contrary, but that, I believe, is dicta. And it relies, if you follow the path and the case that that relies on, you'll see that the case it relies on was not a denial of coverage. So there were no policy proceeds to be at issue in Parkins. And in the case that that relied on, it was a completely different situation because the bad faith had not caused the denial of coverage. And therefore, the court said, if the bad faith doesn't cause the denial of coverage, then you have to have a separate injury. And Waite Hill Services is distinguishable on that ground as well? I'm sorry, Your Honor? Waite Hill Services case? Yes. Same distinction? Yes. Bad faith wasn't? The last issue on the cross-appeal is that there was sufficient evidence for the case to go to the jury. The judge specifically said, it's not free from doubt. That means it should go to the jury. In addition, the court refused to allow the testimony of Weiser Brown's expert on legally inaccurate grounds under Gaubert. I see my time is up. So. Okay. Thank you. I'm sorry to not waive the arguments that you made in your brief, so. And those are covered. Okay, Ms. Mill. I have just a few other points, Your Honor. We're not talking about just every last piece of paper here that is needed. We're talking about what's required for a proof of loss. And why this is important is because insurers, there are good public policy reasons that we enforce proofs of loss. Insurers have valid commercial concerns and public policy reasons why they require these. They have to. The thing is, maybe you can straighten me out on this. We're talking about either accept or reject. So here, you clearly did not have enough evidence to accept. So why couldn't you have just rejected it for the absence of evidence and sent them on the way? We could have rejected them, Your Honor. The reason we did not is because Mr. Weiser wrote back in response to the email that went to the broker saying, we've gotten no responses to these requests for information, no contact, we're going to close the file. He wrote back and said, we're still studying it. We're studying your engineer's response. So St. Paul left the claim file open. I can comply with the statute. If you had rejected, I am rejecting your claim as filed, then you would have incurred no interest penalties under the statute. Yes, we would, Your Honor, because the jury believed that there was an underground blowout. And they found coverage. So if we had rejected it. I understand that. But those damages would not have been under 15, would they? Because you rejected it within 15 days. Is that? Remember, the statute requires to either accept or reject in 15 days. And ultimately, if you're found liable, you're going to come back and have to pay it. Right. We would be liable under Section 058. As a result of the jury verdict. Right. But the analysis is, if you look at Lamar Holmes, which governs this case, the analysis is what they said there. Interest does not run until two things occur. The insured has to submit the invoices and the backup necessary to secure proof of loss, not just determine coverage, because that quantifies and puts a value on the actual out-of-pocket loss. And then the insurer has to fail to pay within the deadline. In that case, there already had been a denial, a denial of a duty to defend. But the court believed the claim was premature because the insured had not presented its actual loss. And nothing had happened that would give rise to the duty to accept or reject the claim and pay it. That's especially true when you have an indemnity policy like we do here with reimbursement wording. Nobody here has argued that the claim for the failure to accept or reject continues, has an ending period. The accrual of that interest has some ending period that is cured by, say, the filing of a complaint, for example. That's correct, Your Honor. The structure of the statute is two claim handling deadlines, two payment deadlines. They're tied to each other. 055, which is the request for information, is tied to 058. 058 expressly references 055 and says it's the catch-all, the 60-day catch-all. Once you have all your requests for information and you've done nothing and you haven't paid within 60 days, interest will apply. 056, which is what we have in this case, is tied to 057. 057 says once you've accepted the claim under 056, you have to pay within five days. If you reject the claim— It doesn't say that, does it? It says if you agreed to pay. I mean, that's more than accept the claim, right? You have to have an agreement. You've settled it. This is how much we owe you. We agreed to owe you. We're going to pay you.  You can't delay your check. But you admit you owed it. Yes, but 057 and 056 are tied so that if you accept the claim in 056, the deadline in 057 starts to run for you to pay the claim. If the insurer doesn't timely pay the claim—and there's cases on this where partial payments have been made— Five-day period? Yes. Five-day period runs from the time that you accept the claim even though you don't know the value of the claim. Well, Your Honor, our position is that's why you can't accept the claim. That's why the deadline doesn't run in 056 for you to accept the claim until you have all the information necessary to secure the proof of loss. One thing you hadn't mentioned, and I inherit, is certifying this case to the Texas Supreme Court. I mean, somebody's raised that issue here. Yes, Your Honor. As a matter of fact. We have. And we believe our position is that the Lamar Rule applies here. And because we never received all information necessary to secure proof of loss, that interest doesn't run. If you disagree whether Lamar applies, then we believe that should be certified to the Texas Supreme Court so that they can determine when interest begins to run. You've got a lot of procedural problems in this case that may bar sending a clean question to the Texas Supreme Court. Okay, thank you very much. Thank you, Your Honor. We request that the